Gary Meyerhoff (*Pro Hac Vice* motion to be filed)
Hugh M. McDonald
Keith C. Nusbaum
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas, 23rd Floor
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUFFOLK FEDERAL CREDIT UNION, <br><br> Plaintiff, <br><br> vs. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION <br><br> Defendant. | Civil Action No. 10-_____ <br><br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Suffolk Federal Credit Union ("Suffolk"), 3681 Horseblock Road, P.O. Box 9005, Medford, NY 11763, by and through its undersigned counsel, for its Complaint, on knowledge as to its own acts and on information and belief as to all other matters, alleges against defendant Federal National Mortgage Association ("Fannie Mae"), 3900 Wisconsin Ave. NW, Washington, D.C. 20016, as follows:

## SUMMARY OF ACTION

1.      Plaintiff Suffolk is a cooperative, not-for-profit credit union that, among other things, provides residential mortgage loans to its members.  Suffolk's members are predominantly blue collar workers from Suffolk County, New York and its municipalities, including firefighters, police officers, emergency medical technicians, social services workers, and other low to middle income employees.

2.      Defendant Fannie Mae is the government created, private-shareholder owned corporation at the center of the mortgage crisis that precipitated a nationwide economic collapse, requiring one of the most sweeping government interventions into the private financial markets in many decades.  In hearings before Congress in connection with its bailout, as well as in other contexts, Fannie Mae has admitted publicly that weaknesses in its internal controls helped to cause its unprecedented financial failure, a failure now being funded by the American taxpayer.

3.      As a not-for-profit cooperative of Suffolk's size, Suffolk relies on an outside company to handle the origination and servicing of the loans it provides to its members. Suffolk also needs, from time to time, to balance its portfolio by selling a portion of the residential mortgage loans it originates in the secondary mortgage market.  Fannie Mae has set and controlled that market by, among other things, only purchasing mortgage loans through companies it picks and certifies as Fannie Mae "authorized" sellers.  Fannie Mae made U.S. Mortgage Corp. ("U.S. Mortgage") an authorized seller and jointly pursued the credit unions market with U.S. Mortgage to increase its mortgage loan volume and market share.

4.      Suffolk and dozens of other credit unions retained a division of U.S. Mortgage, CU National Mortgage, LLC ("CU National"), to act as its mortgage servicer.  Since 2003, CU National assisted Suffolk in originating new mortgage loans and servicing Suffolk's loan portfolio.  When Suffolk instructed CU National to facilitate the sales of selected mortgage loans to Fannie Mae, CU National would arrange for Suffolk to make the sales through U.S. Mortgage.

5.      Fannie Mae's relationship with U.S. Mortgage and its CEO, Michael McGrath, grew substantially since 2003.  McGrath became a major Fannie Mae shareholder.  He was

invited by Fannie Mae to sit on its Customer Advisory Board.  And Fannie Mae authorized McGrath to open an account in U.S. Mortgage's name to trade mortgage-backed securities at Fannie Mae's trading desk.  Fannie Mae's zeal to increase business through U.S. Mortgage, however, came at a great cost, blinding Fannie Mae to a series of red flags that U.S. Mortgage was in serious financial trouble.

6.      Fannie Mae approved, and then routinely re-approved, U.S. Mortgage as its authorized seller and dramatically increased U.S. Mortgage's securities trading limits.  But Fannie Mae failed to follow its own procedures and guidelines for tracking its authorized sellers' financial condition.  Fannie Mae ignored obvious signs of falsified financial statements, payment irregularities, co-mingling of funds, and dangerously speculative securities trading, all of which pointed to a situation ripe for fraud.  Fannie Mae also fed the growing fire by approving trading limit increases for U.S. Mortgage.  All Fannie Mae cared about when it came to U.S. Mortgage was that it would continue to sell Fannie Mae credit union loans.

7.      Well, Fannie Mae should have cared.  In 2009, Suffolk learned that U.S. Mortgage had stolen 189 of the mortgage loans it was servicing (the "Stolen Mortgages"), worth more than $42 million and sold them to Fannie Mae.  McGrath and another U.S. Mortgage employee, Ron Carti, had prepared and signed loan transfer documents that falsely identified themselves as executives of Suffolk.  Fannie Mae accepted the documents and paid U.S. Mortgage millions of dollars without ever checking into McGrath's or Carti's authority to execute loan transfer documents on behalf of Suffolk.  U.S. Mortgage stole loans in similar fashion from 28 other credit unions worth another $100 million.

8.      In addition to its failure to monitor and supervise U.S. Mortgage's activities, Fannie Mae also failed to employ any fraud detection procedures when it received the

fraudulent loan transfer documentation U.S. Mortgage was passing to it -- not even the minimal check cashing procedures followed by most banks.  For example, Fannie Mae failed to notice that McGrath and Carti had identified themselves on the documentation as being the officers of 28 separate companies, located in multiple states, or that the mortgage assignments purportedly from these companies were all notarized in one state, New Jersey.

9.     U.S. Mortgage had concealed its actions from Suffolk and the other credit unions for years by continuing to make monthly payments on the stolen mortgages as if they remained in the credit unions' portfolios.  By the time the thefts had been discovered, U.S. Mortgage was bankrupt.  Only a small portion of what Fannie Mae had paid could be recovered.  McGrath has already pleaded guilty to these thefts and awaits sentencing.

10.     In meetings and by letter dated May 5, 2009, Suffolk has demanded that Fannie Mae return its Stolen Mortgages.  Fannie Mae refused.  Fannie Mae asserts that it was unaware of the fraud and purchased the notes in "good faith," entitling Fannie Mae to keep them as a "holder in due course."

11.     Fannie Mae's claim to be an innocent dupe is belied by its involvement with U.S. Mortgage and the red flags it ignored.  Fannie Mae also misreads the law -- purchasers of negotiable instruments who stick their heads in the sand cannot claim ownership of stolen property.  To be a holder in due course, one must not only have subjective good faith, but must act commercially reasonably, and Fannie Mae did not do that here.  Suffolk is entitled to recover against Fannie Mae for conversion of the Stolen Mortgages, as well as for the damages caused by its rampant negligence.

## PARTIES

12.     Plaintiff  Suffolk is a federal credit union organized, operating and conducting business in accordance with the laws of the United States of America, with a principal place of business located in Medford, New York.

13.     Defendant Fannie Mae is a federal government sponsored enterprise chartered in 1968 by the United States Congress as a private shareholder owned corporation.  Its principal place of business is at 3900 Wisconsin Avenue, N.W., Washington, D.C.  The Federal Housing Finance Agency ("FHFA") was appointed conservator of Fannie Mae on or about September 7, 2008.  While in conservatorship, Fannie Mae continues to operate and conduct business.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this case and the parties named herein pursuant to 28 U.S.C. § 1332 on the basis of diversity of citizenship, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a).

### FANNIE MAE'S PURSUIT OF THE CREDIT UNION MARKET AND RELATIONSHIP WITH U.S. MORTGAGE AND MICHAEL MCGRATH

16.     U.S. Mortgage's CEO, Michael McGrath, was well known to Fannie Mae.

17.     Fannie Mae picked its company, U.S. Mortgage, as the authorized seller it would use to penetrate deeper into the credit union market.

18.     The credit union market was a desirable one for Fannie Mae because the high quality of that market's loan portfolios -- historically low default rates, low credit risk, and competitive interest rates.

19.     Fannie Mae approved and re-approved U.S. Mortgage as its authorized seller repeatedly from 2003 to 2009, the period at issue.

20.     Fannie Mae encouraged U.S. Mortgage to grow its business with the credit unions.  At times, Fannie Mae provided U.S. Mortgage with leads for new credit union business to pursue.

21.     As a result of these joint efforts, the volume of mortgages Fannie Mae purchased increased, as did U.S. Mortgage's sales and mortgage servicing businesses.

22.     Fannie Mae's business interests were served by keeping McGrath and U.S. Mortgage happy and in place as its authorized seller so it could continue to purchase large volumes of mortgages from credit unions like Suffolk.

23.     McGrath himself had purchased more than one million shares of Fannie Mae stock, making him a significant shareholder.

24.     Fannie Mae made McGrath a member of its Customer Advisory Board (the "CAB").  The CAB is a group of mortgage sellers that Fannie Mae uses to gain information on the needs of its customers.  Fannie Mae appoints to the CAB persons it considers its best sellers in the region or up-and-coming stars in mortgage loan sales.

25.     As part of the CAB, McGrath traveled to Phoenix and Philadelphia to participate in conferences with Fannie Mae executives and members of Fannie Mae's purchasing teams.  During the CAB conferences, participants would discuss Fannie Mae procedures, provide insight on how to make Fannie Mae's products more competitive, and hear from Fannie Mae executives about upcoming promotions to enhance Fannie Mae's ability to increase its loan purchasing volume and market share.

26.     Being a member of the CAB was seen as a privilege for a mortgage seller, and Fannie Mae gave McGrath that privilege to maintain a close relationship with him as part of its effort to maintain and increase its penetration into the credit union market.

27.     Fannie Mae also had a substantial securities trading relationship with U.S. Mortgage and McGrath.  When U.S. Mortgage initially started selling residential mortgages to Fannie Mae, it used Fannie Mae's trading desk -- like many residential mortgage sellers -- as a hedging tool to cover potential losses that could arise from unexpected changes in the market.

28.     Initially, Fannie Mae provided to U.S. Mortgage a line of credit of about $5 million, which was sufficient to cover trades made for hedging purposes.  As U.S. Mortgage increased the volume of mortgage loan sales to Fannie Mae, it was permitted large increases in the line of credit available.  U.S. Mortgage would simply request an increase from the Fannie Mae trading desk.  After a "review" of U.S. Mortgage's financials and net worth, Fannie Mae would approve an increase.  The line of credit Fannie Mae offered increased to as much as $100 million.

29.     Despite significant losses, Fannie Mae failed to make margin calls on its business partner, U.S. Mortgage until late in 2008, a few months before U.S. Mortgage's collapse.

30.     From 2003 to 2009, U.S. Mortgage's financial condition deteriorated.  To cover mounting losses, U.S. Mortgage began stealing credit union loans, selling them to Fannie Mae without authorization, and pocketing the proceeds from the sales.

### SUFFOLK'S AUTHORIZED MORTGAGE LOAN SALES TO FANNIE MAE

31.     Suffolk began its relationship with U.S. Mortgage and CU National in 2003.

32.     Suffolk and CU National were parties to a Mortgage Services Agreement dated February 1, 2003 ("Servicing Agreement"), under which CU National agreed to perform certain residential mortgage-related services for Suffolk, including the origination and servicing of residential mortgage loans.

33.     The Servicing Agreement is the only written agreement between Suffolk and either CU National or U.S. Mortgage.  Virtually all of its terms concern the servicing of Suffolk's mortgage loan portfolio.

34.     The Servicing Agreement also provides that CU National would "facilitate the sale of loans that [Suffolk] can not or does not wish to keep in its portfolio to the secondary market, when possible."  In accordance with this provision, as mortgage loans were originated, Suffolk would instruct CU National as to whether such new loans were to be retained in Suffolk's portfolio or offered for sale to Fannie Mae.

35.     In cases where Suffolk had identified a mortgage loan to be sold to Fannie Mae, to comply with Fannie Mae's requirement that it only purchase mortgage loans from approved sellers, mortgage loan sales from Suffolk to Fannie Mae had to be made in a two step process.

36.     In the first step, Suffolk would endorse an allonge to the loan's promissory note to U.S. Mortgage and execute a mortgage assignment to U.S. Mortgage.  On authorized sales, the endorsements to U.S. Mortgage were made by a Suffolk employee authorized to sign on Suffolk's behalf.  In the second step, U.S. Mortgage would endorse an allonge to the note in blank and, in some circumstances, a mortgage assignment to Fannie Mae.  The paperwork from both steps would be delivered to Fannie Mae, Fannie Mae would transfer payment to U.S. Mortgage, and U.S. Mortgage would turn those funds over to Suffolk.

37.     CU National prepared and provided Suffolk with statements of account that included data on the servicing of mortgage loans in Suffolk's portfolio, including the monthly payments made by borrowers on those loans, as well as on the funds received on sales of mortgage loans to Fannie Mae through U.S. Mortgage.

## U.S. MORTGAGE'S SALE OF THE STOLEN MORTGAGES TO FANNIE MAE

38.     From 2004 to 2009, as U.S. Mortgage's financial condition deteriorated and its trading losses mounted, it began stealing mortgage loans from Suffolk and other credit unions, selling them to Fannie Mae without the credit unions' knowledge or authorization, and using the proceeds from the sales to cover, among other things, its losses and operating expenses.

39.     U.S. Mortgage officers and employees, including Michael McGrath and Ron Carti, selected loans Suffolk had instructed CU National to retain in Suffolk's portfolio and, instead of retaining them, sold those loans to Fannie Mae without Suffolk's knowledge or authorization.  U.S. Mortgage sold Stolen Mortgages to Fannie Mae in 2004, 2005, 2006, 2007, 2008, and 2009.

40.     Fannie Mae paid U.S. Mortgage for 189 Stolen Mortgages worth more than $142 million, all of which were sold to it by U.S. Mortgage or its representatives without Suffolk's knowledge or authorization.

41.     U.S. Mortgage sold the Stolen Mortgages to Fannie Mae by having McGrath and Carti execute the first step documentation themselves.  McGrath and Carti signed the allonges to the notes and the mortgage assignments that only authorized Suffolk employees could sign.  Some of the documents were signed by McGrath and some were signed by Carti.

42.     Thus, the names "Michael McGrath" and "Ron Carti" appear on signature blocks on the allonges to the notes and on the mortgage assignments for virtually all of the Stolen Mortgages.  The signature blocks identify either McGrath or Carti as "AVP Suffolk."  The documents are signed in McGrath's or Carti's name.  The mortgage assignments are all notarized by a New Jersey notary public.

43.     Neither McGrath nor Carti was, at any time, an AVP or Assistant Vice President of Suffolk.  Neither held any position at Suffolk at any time.

44.     There is no provision in the Servicing Agreement that gave CU National, U.S. Mortgage, McGrath, Carti, or any other executive or employee of CU National or U.S. Mortgage the authority to execute any documents on Suffolk's behalf.

45.      There is no agreement or other writing in which Suffolk gave authority to McGrath or Carti to execute any loan transfer documents on Suffolk's behalf.

46.     Suffolk never told McGrath orally that he could execute any loan transfer documents on Suffolk's behalf.

47.     Suffolk never told Carti orally that he could execute any loan transfer documents on Suffolk's behalf.

48.     McGrath has already pleaded guilty to crimes in connection with his unauthorized sales of the Stolen Mortgages and, in doing so, has admitted that he and Carti executed loan transfer documents purportedly on Suffolk's behalf without Suffolk's authorization.

49.     U.S. Mortgage delivered to Fannie Mae the loan transfer documentation for the Stolen Mortgages.  Fannie Mae contends that it possesses the original note, signed by the borrower, for every one of the Stolen Mortgages.

50.     It is unclear whether the notes U.S. Mortgage provided to Fannie Mae for all of the Stolen Mortgages are all authentic, original notes executed by the Suffolk member borrowers.  Some of the notes in Fannie Mae's possession appear to contain forgeries. Some of the notes recovered from U.S. Mortgage's records appear to be authentic originals.

51.     In meetings between Suffolk and McGrath since he pleaded guilty, McGrath admitted that he did not always deliver an authentic original note to Fannie Mae in his unauthorized sales. On some transactions, McGrath admitted that he forged the name of the

borrower on a newly created note.  On others, McGrath admitted that he had color copies of notes made and delivered a copy of the note to Fannie Mae.

52.     Fannie Mae accepted the loan transfer paperwork U.S. Mortgage presented to it on the Stolen Mortgages and paid U.S. Mortgage the purchase price for the Stolen Mortgages.  Fannie Mae made payment by transferring funds to a U.S. Mortgage bank account.

53.     U.S. Mortgage did not deliver to Suffolk the funds Fannie Mae paid U.S. Mortgage for the Stolen Mortgages.

54.     U.S. Mortgage concealed its theft of the Stolen Mortgages from Suffolk by having CU National, in the documentation and accounts it prepared for Suffolk, treat the Stolen Mortgages as if they remained in Suffolk's mortgage loan portfolio.  Suffolk was credited with the monthly payments due on the Stolen Mortgage loans, even though CU National -- acting as Fannie Mae's servicer on the Stolen Mortgages -- was sending the actual payments it was receiving from Suffolk members to Fannie Mae.

55.     In January 2009, an unrelated criminal investigation prompted a U.S. Mortgage employee to disclose U.S. Mortgage's theft and fraud to federal investigators.  The FBI raided U.S. Mortgage's offices and exposed the fraud.  In February 2009, U.S. Mortgage's general counsel informed Suffolk that U.S. Mortgage had sold its mortgage loans "without authority to Fannie Mae and the sale proceeds [were] subsequently diverted."  Prior to receiving this notice, Suffolk did not know that any of the Stolen Mortgages had been sold to Fannie Mae.

**FANNIE MAE PURCHASED THE STOLEN MORTGAGES WITHOUT
TAKING COMMERCIALLY REASONABLE STEPS TO DETECT FRAUD**

56.     At all relevant times, Fannie Mae's general practices and procedures for the review of loan transfer paperwork did not include any steps to determine whether its authorized seller was committing a fraud or passing forged documents.

57.     Fannie Mae's general practices and procedures required that it verify that the final endorsement on a mortgage loan was made, in blank, by a Fannie Mae authorized seller, and that the paperwork provided evidenced no break in the chain of endorsements from the initial lender to the authorized seller to Fannie Mae.

58.     Fannie Mae's practices and procedures did not include the review of intervening endorsements for indicia of fraud.  Nor did they include any inspection of the borrower's signatures on the notes Fannie Mae was purchasing to determine whether there were indicia of forgery.

59.     Fannie Mae failed to review the documentation U.S. Mortgage presented to it for the Stolen Mortgages to determine whether there was any indicia of fraud.

60.     Fannie Mae did not review the intervening endorsements executed by McGrath and Carti on the Stolen Mortgages for any purpose other than to determine whether there was a break in the chain of endorsements.

61.     Had Fannie Mae reviewed the documentation that U.S. Mortgage had presented to it for credit union sales, it would have discovered indicia of fraud in that documentation and been alerted to U.S. Mortgage's massive fraud.

62.     Had Fannie Mae reviewed the documentation on the Stolen Mortgages, it would have noticed that in each transaction, the executives purporting to sign on behalf of  Suffolk, a New York entity, were having their signatures notarized in New Jersey on *the same day*

that U.S. Mortgage, a New Jersey entity, was endorsing the notes in question in blank to be tendered to Fannie Mae.

63.     Indicia of fraud were discernible on the face of the documentation used to sell the Stolen Mortgages to Fannie Mae, and should have raised suspicions as to the authenticity of that documentation and the possibility that a fraud was being committed.

64.     Fannie Mae did not receive the Stolen Mortgage paperwork in isolation. McGrath would forward documentation for the sales of mortgage loans for multiple credit unions at the same time.   Fannie Mae would receive this documentation in bundles.

65.     Had Fannie Mae examined this documentation, it would have noticed that McGrath and Carti were executing the intervening endorsements as purported executives and employees of dozens of credit unions, located in multiple states, with all of the documents being notarized in New Jersey.

66.     No reasonable person, and no entity acting in a commercially reasonable fashion, could have expected these individuals to have been employed by these many separate entities, raising suspicions as to the activities of McGrath, Carti, and U.S. Mortgage.

67.     McGrath was well known to Fannie Mae as the Chief Executive of U.S. Mortgage, its authorized seller, a member of its Customer Advisory Board, and its chosen partner in pursuing the credit union market.  It would not be possible for McGrath to have simultaneously been an executive and employee of the very credit unions Fannie Mae sought to obtain business from through U.S. Mortgage.

68.     Fannie Mae's conduct in failing to review the Stolen Mortgage paperwork was at least negligent, if not grossly negligent or reckless.

69.     Fannie Mae's loan transfer documentation procedures would have failed to catch U.S. Mortgage even if it was perpetrating a fraud on Fannie Mae in every one of the

thousands of transactions it entered into with U.S. Mortgage. Fannie Mae never would have known even if *all* of those loans were stolen.

70.     On or about December 22, 2008, Fannie Mae was specifically informed by the U.S. Attorney's Office that the government was investigating CU National and U.S. Mortgage for the unauthorized sale of credit union loans to Fannie Mae. After this notification, Fannie Mae purchased Stolen Mortgages valued in excess of $6.6 million from U.S. Mortgage.

## FANNIE MAE NEVER CHECKED U.S. MORTGAGE'S AUTHORITY TO SELL THE STOLEN MORTGAGES OR SIGN DOCUMENTS ON SUFFOLK'S BEHALF

71.     The promissory notes in the Stolen Mortgages were issued to the order of Suffolk.

72.     To qualify as a "holder" of the negotiable instruments in question, the individuals endorsing those instruments -- McGrath and Carti -- had to have actual or apparent authority to execute those documents on Suffolk's behalf. Without such authority, Fannie Mae has no legal claim to the Stolen Mortgages.

73.     Suffolk did not give CU National, U.S. Mortgage, McGrath, or Carti any actual authority to sell any mortgage loans on Suffolk's behalf.

74.     The only authority Suffolk gave to CU National, U.S. Mortgage, or its representatives was the authority to facilitate Suffolk's sale of mortgage loans, but only in cases where Suffolk directed CU National to facilitate those sales and where Suffolk signed the loan transfer documentation.

75.     Suffolk did not direct U.S. Mortgage to sell the Stolen Mortgages.

76.     Suffolk did not authorize McGrath or Carti to hold themselves out as executives or employees of Suffolk

77.    Suffolk did not authorize McGrath or Carti to sign loan transfer documentation on behalf of Suffolk.

78.    Fannie Mae contends that U.S. Mortgage, McGrath, and Carti had "apparent authority" to sell the Stolen Mortgages -- that it formed a reasonable belief that Suffolk had given them such authority.

79.    Fannie Mae also has claimed that there was a custom and practice, or course of conduct, for the execution of loan transfer documentation on sales Suffolk had authorized -- with McGrath or Carti executing the documents on Suffolk's behalf.   Fannie Mae contends that it relied upon this custom and practice when purchasing the Stolen Mortgages.

80.    Fannie Mae did not form any "reasonable belief" about McGrath's or Carti's authority, nor did Fannie Mae observe any custom and practice on authorized sales.  Fannie Mae's loan documentation review procedures did not allow for any such beliefs to be formed nor observations to be made.

81.    No one at Fannie Mae formed a reasonable belief as to what authority Suffolk had or had not given to U.S. Mortgage, McGrath, or Carti when Fannie Mae paid U.S. Mortgage for the Stolen Mortgages.

82.    When Fannie Mae paid U.S. Mortgage for the Stolen Mortgages, no one at Fannie Mae had formed *any* belief as to the scope of authority U.S. Mortgage, McGrath, or Carti had with respect to selling Suffolk mortgage loans.

83.    No one at Fannie Mae involved with the decision to purchase the Stolen Mortgages had, at the time they were purchased, (a) formed their own belief, (b) been informed that Fannie Mae had formed a belief, or (c) been informed that anyone employed by Fannie Mae had formed a belief as to the scope of authority U.S. Mortgage, McGrath, or Carti had with respect to selling Suffolk mortgage loans.

84.     To the extent that Fannie Mae relied on the manifestations of anyone in connection with Suffolk loan sales, it relied on the manifestations of the purported agent -- U.S. Mortgage -- and not the manifestations of Suffolk, the principal.

85.     When Fannie Mae paid U.S. Mortgage for the Stolen Mortgages, Fannie Mae did not have in its possession the Servicing Agreement between Suffolk and CU National.

86.     No one at Fannie Mae had seen or read the Servicing Agreement between Suffolk and CU National until after U.S. Mortgage's fraud had been made public.

87.     Fannie Mae did not rely on any of the terms of the Servicing Agreement when it purchased the Stolen Mortgages.

88.     All of Fannie Mae's observations about "authorized" sales of Suffolk mortgage loans were based on the manifestations of U.S. Mortgage and its executives and employees. All of the paperwork submitted to Fannie Mae in connection with its purchase of authorized Suffolk mortgage loans was delivered by U.S. Mortgage.  Fannie Mae observed no manifestations of Suffolk itself, or any Suffolk executives or employees, in connection with authorized sales.

89.     When Fannie Mae paid U.S. Mortgage for the Stolen Mortgages, no one at Fannie Mae was aware of any agreement, writing or document prepared or executed by Suffolk or any Suffolk executive or employee that would cause Fannie Mae to believe that U.S. Mortgage, McGrath, or Carti had any authority to act on Suffolk's behalf.

90.     When Fannie Mae paid U.S. Mortgage for the Stolen Mortgages, no one at Fannie Mae had witnessed any statement made by any Suffolk executive or employee that would cause Fannie Mae to believe that U.S. Mortgage, McGrath, or Carti had any authority to act on Suffolk's behalf.

91.     When Fannie Mae paid U.S. Mortgage for the Stolen Mortgages, no one at Fannie Mae had witnessed any conduct by any Suffolk executive or employee that would cause Fannie Mae to believe that U.S. Mortgage, McGrath, or Carti had any authority to act on Suffolk's behalf.

92.     Fannie Mae took no steps to determine whether McGrath or Carti had been authorized by Suffolk to execute loan transfer paperwork on its behalf.

93.     Fannie Mae took no steps to determine whether McGrath or Carti were employed by Suffolk.

94.     Fannie Mae paid U.S. Mortgage for the Stolen Mortgages without taking any steps to determine the scope of U.S. Mortgage's, McGrath's, or Carti's authority with respect to selling the Stolen Mortgages.

95.     Since Fannie Mae cannot demonstrate that U.S. Mortgage, Carti, or McGrath had actual or apparent authority to sell the Stolen Mortgages, it cannot be a holder in due course of the Stolen Mortgages and is legally obligated to return them.

**FANNIE MAE IGNORED U.S. MORTGAGE'S GROWING FINANCIAL TROUBLES AND TRADING LOSSES, RED FLAGS OF THE FRAUD IT WAS PERPETRATING**

96.     Having chosen to employ no fraud detection measures in its purchases of mortgage loans, Fannie Mae apparently sought to protect itself from fraud through other means -- by purchasing mortgage loans only from approved, authorized sellers.

97.     Fannie Mae built in rights in its contractual relationships with its authorized sellers to ensure that sales involving questionable title could be reversed.  Fannie Mae would demand return of its funds and would return the loan to the seller, or require the seller to substitute a properly documented loan.

98.     To ensure its ability to effectuate reversals where needed, Fannie Mae established procedures that required its sellers to go through an approval process that included the

presentation of audited financial statements.  They were required to submit financial statements quarterly so that Fannie Mae would be able to monitor closely a seller/servicer's financial ability to return funds on questionable loans.

99.     Fannie Mae had procedures for monitoring and approving its authorized sellers because it believed such procedures were necessary.

100.     While U.S. Mortgage's financial condition was supposed to have been monitored through this process, Fannie Mae paid little attention to what U.S. Mortgage filed with Fannie Mae.  In other words, Fannie Mae did not follow its own regulations, regulations that would have alerted it to issues with the financial wherewithal of its authorized seller, U.S. Mortgage.

101.     For example, Fannie Mae's seller/servicer guide required the delivery of quarterly and annual financial statements, purportedly so that Fannie Mae can establish an entity's solid financial condition in connection with the approval and re-approval process.  Fannie Mae also was supposed to use the financial statements to evaluate U.S. Mortgage's net worth in connection with establishing trading limits.

102.     Fannie Mae's approval process for U.S. Mortgage to be an authorized seller, however, constituted little more than checking a box to indicate that the financial statements had been received.  McGrath stated that he had not been audited at all from 1996, when he first began doing business with Fannie Mae, until the fall of 2008.

103.     U.S. Mortgage had created financial statements both for external audit purposes and to advise customers and Fannie Mae of U.S. Mortgage's financial condition.  The financial statements that were submitted, however, had major discrepancies.

104.     For example, U.S. Mortgage's financial statements were materially inaccurate due to the excessive value placed on its servicing rights.   U.S. Mortgage reported a value

for servicing rights for higher than the amount Fannie Mae was paying U.S. Mortgage for servicing its own loans.  Had U.S. Mortgage properly valued the servicing rights, its net worth would have been roughly a third of its stated net worth or lower in some of the years at issue.

105.    With U.S. Mortgage's net worth reported at a level just above Fannie Mae's requirements for it to be re-approved as a seller/servicer, these numbers appear to have been reverse-engineered.

106.    Fannie Mae had little interest in verifying or investigating the numbers presented by U.S. Mortgage.  It was interested in sales volume.  Had Fannie analyzed U.S. Mortgage under the proper value, Fannie Mae would have uncovered these financial discrepancies. That would have led Fannie Mae either to uncover the fraudulent and unauthorized sales, or at a minimum, to have terminated its relationship with U.S. Mortgage preventing further thefts.  Its failure to do so constituted negligence and an absence of commercial reasonableness.

107.    U.S. Mortgage's financial statements also contained no reference to U.S. Mortgage's significant trading activities -- neither the losses it was incurring, nor the fees and interest U.S. Mortgage paid to Fannie Mae's trading desk for its line of credit.

108.    U.S. Mortgage's credit line increased from its original $5 million to $100 million without the posting of any collateral, an amount wildly out of proportion to the net worth of U.S. Mortgage and its net cash flow.   McGrath began losing money before 2004, running negative balances in his Fannie Mae trading account as high as $5 million.  As much as $1 to $1.5 *billion* in trades ran through McGrath's account in a year.

109.    The frequency and volume of U.S. Mortgage's trading would have appeared to anyone examining the activity as obvious and potentially dangerous market speculation.

110.    In 2007, U.S. Mortgage's trading losses reached between six and seven million dollars.  At several points, it was carrying trading losses which were more than half of its declared net worth.

111.    Fannie Mae did not issue a margin call or otherwise pressure U.S. Mortgage to cover any of its losses.  While McGrath recalls a Fannie Mae inquiry as to whether U.S. Mortgage was actually hedging or was instead speculating on the mortgage backed securities market, Fannie Mae accepted McGrath's affirmation that U.S. Mortgage's trading was not speculative, despite overwhelming evidence to the contrary and without any independent examination of the underlying trades.

112.    It was not until the Fall of 2008, a few months before the FBI raided U.S. Mortgage's offices, that Fannie Mae finally made a multi-million dollar margin call on U.S. Mortgage.  The margin call was unexpected.  U.S. Mortgage did not have enough unauthorized loans prepared to sell on such short notice -- its only source of cash -- to cover the margin call.

113.    McGrath delayed making the payment for several days, using a litany of excuses to buy time.  U.S. Mortgage ultimately covered the loss by making unauthorized sales to Fannie Mae and immediately making a payment back.  At the same time, the United States mortgage market was faltering and the U.S. economy crashing, but U.S. Mortgage's mortgage sales to Fannie Mae were increasing.  No audit or inquiry was prompted by the confluence of these events.  Fannie Mae paid U.S. Mortgage for many Stolen Mortgages after the margin call, until U.S. Mortgage was finally exposed by third parties.

114.    These trading losses were known not only at Fannie Mae's trading desk, but to Fannie Mae's primary contact with U.S. Mortgage on the mortgage servicing and sales side.

115.   Critically, U.S. Mortgage failed to disclose its multi-million dollar trading losses in the audited financial statements it submitted to Fannie Mae each year, submissions Fannie Mae required in connection with McGrath's trading limit *and* U.S. Mortgage's re-certification as an approved seller-servicer.

116.   U.S. Mortgage also failed to note that it was engaging in "hedging" activities, as required by GAAP.  Fannie Mae re-certified U.S. Mortgage -- leaving it free to steal from the credit unions -- even though it was receiving obviously false financial statements.

117.   Fannie Mae knew that U.S. Mortgage was hedging (at a minimum) and had incurred losses in the multi-millions, but overlooked the omission of that information from U.S. Mortgage's financial statements.  Fannie Mae was the only entity in possession of the information needed to notice the misrepresentations in U.S. Mortgage's financial statements. Had Fannie Mae made an inquiry into how U.S. Mortgage was able to sustain such significant trading losses in relation to its overall net worth, it is highly likely that Fannie Mae would have uncovered the unauthorized loan sales.

118.   Fannie Mae's lack of care and diligence in its supervision and management of U.S. Mortgage led to a missed opportunity to uncover U.S. Mortgage's fraudulent conduct in 2005.

119.   An accountant representing several credit unions became concerned by extensive delays in U.S. Mortgage's remittance of sale proceeds from loans sold to Fannie Mae, in some cases lasting several months.  These concerns prompted the accountant to complain *to Fannie Mae*.

120.   Fannie Mae responded by conducting an "investigation" of U.S. Mortgage, but a superficial one.  Fannie Mae never discovered that the reason for the delays related to the difficulties U.S. Mortgage had in managing a kind of "ponzi" scheme -- the complicated

process of keeping track of separate books to make payments on loans no longer in the credit unions' portfolios.

121.   Fannie Mae went to the offices of U.S. Mortgage to look into the complaints. Instead of requesting a review of the loan transactions that involved the delayed payments, U.S. Mortgage selected and presented to Fannie Mae examples of loans that had just closed, loans that U.S. Mortgage had processed properly and in a timely fashion.

122.   Fannie Mae accepted this immaterial evidence and U.S. Mortgage's false representations about the causes for the delays without further inquiry.

123.   This "investigation" stood in stark contrast to investigations and audits Fannie Mae performed when U.S. Mortgage had delays in paying borrowers' funds *to Fannie Mae*.

124.   Fannie Mae required that funds due on the loans U.S. Mortgage was servicing for Fannie Mae be paid within *two days*.  U.S. Mortgage's bank had been failing to clear the checks U.S. Mortgage received from borrowers for Fannie Mae for five to ten days, prompting U.S. Mortgage to advance the funds from its corporate accounts and then repay itself when the checks cleared.  These delays and these processes prompted what McGrath called a "red light audit," putting U.S. Mortgage under close scrutiny for six months.  U.S. Mortgage changed banks and accounting practices at Fannie Mae's direction to comply with the results of the audit.

125.   When the issue concerned funds that were not being paid to the credit unions, with delays of weeks and months, Fannie Mae apparently had little interest.  Fannie Mae failed to inquire, or determine for itself, why there would be any delay in payments of loan sale proceeds to credit unions.

126.   If U.S. Mortgage was merely serving as a conduit for the remittance of such proceeds to credit union sellers, there would be no reason for any delays in the release of

funds wired to U.S. Mortgage for the credit unions. Fannie Mae failed to press U.S. Mortgage to provide access to paperwork other than what U.S. Mortgage had hand-picked to present.

127. Fannie Mae did not investigate the accounting practices or safeguards U.S. Mortgage had in place to ensure that funds due to the credit unions were being handled properly. Had it done so, it likely would have discovered the fraud.

128. Fannie Mae also failed to investigate or question U.S. Mortgage when it set up a second payee account for the receipt of loan sale proceeds and requested that Fannie Mae send funds to that account. Having two separate general accounts served no creditable business purpose. U.S. Mortgage used the second account to handle funds on unauthorized loan sales, funds it would not be turning over to credit unions.

## COUNT I -- CONVERSION

129. Suffolk repeats, restates and realleges each and every allegation contained in paragraphs 1 through 128 as though fully set forth herein.

130. Suffolk originated the Stolen Mortgages, residential home loans for its members, loaning millions of dollars to those members. The notes underlying the Stolen Mortgages were issued to the order of Suffolk. The mortgages underlying the Stolen Mortgages were executed in favor of Suffolk.

131. The Stolen Mortgages purportedly were transferred from Suffolk to U.S. Mortgage through the unauthorized and fraudulent endorsements of McGrath or Carti on loan transfer documentation. U.S. Mortgage then endorsed each of the Stolen Mortgages in blank for transfer to Fannie Mae.

132.    U.S. Mortgage, McGrath, and/or Carti then delivered the Stolen Mortgages to Fannie Mae in return for certain payments.  The payments Fannie Mae made to U.S. Mortgage were never given to Suffolk.

133.    U.S. Mortgage, McGrath, and Carti were not officers, directors or employees of Suffolk and were never authorized to execute allonges to notes or assignments of mortgages to Fannie Mae.

134.    While Fannie Mae may have paid sums of money to U.S. Mortgage, the loans it was purchasing were, in fact, the Stolen Mortgages -- stolen property of Suffolk.

135.    When Suffolk learned of the unauthorized and fraudulent transfers of the Stolen Mortgages to Fannie Mae, it promptly and properly demanded that Fannie Mae return the Stolen Mortgages, that Fannie Mae account for any proceeds it received as a result of the Stolen Mortgages, and that Fannie Mae pay such funds to Suffolk.

136.    Fannie Mae is not a holder of the Stolen Mortgages because the Suffolk endorsements executed to transfer the Stolen Mortgages to U.S. Mortgage were not executed by persons with actual or apparent authority to endorse notes in Suffolk's name.

137.    Fannie Mae is not a holder in due course of the Stolen Mortgages because it did not take the instruments in question in good faith.

138.    Fannie Mae cannot claim to have taken the instruments in the Stolen Mortgages in good faith because it failed to observe reasonable commercial standards of fair dealing.

139.    Fannie Mae has failed to return the Stolen Mortgages to Suffolk.

140.    Accordingly, Fannie Mae has exercised, and continues to exercise, wrongful dominion and control over the Stolen Mortgages and all proceeds of the Stolen Mortgages, to the exclusion and detriment of Suffolk, willfully and wantonly evidencing a reckless disregard for the rights of Suffolk.

141.     Fannie Mae has converted Suffolk's property, causing Suffolk significant financial injury.

**WHEREFORE,** Suffolk demands judgment in its favor and against Fannie Mae for compensatory damages in an amount not less than the outstanding balance on the Stolen Mortgages plus all payments received in connection with the Stolen Mortgages, an amount believed to be in excess of $42 million.  Suffolk further demands an accounting of the amounts received in connection with the Stolen mortgages, consequential damages (including but not limited to reasonable attorneys' fees and disbursements), punitive damages, costs of suit, and such other and further relief as the Court deems just and proper.

## COUNT 2 -- NEGLIGENCE

142.     Suffolk repeats, restates and realleges each and every allegation contained in paragraphs 1 through 141 as though fully set forth herein.

143.     Fannie Mae was in the business of purchasing mortgage loans.

144.     The credit union market was a desirable market for Fannie Mae because of its historically low default rates, low credit risk, and competitive interest rates.

145.     Fannie Mae pursued, initiated, and fostered a relationship with U.S. Mortgage designed to penetrate the credit union market and to increase the volume of its purchases.

146.     Fannie Mae actively pursued the purchase of mortgage loans from Suffolk through U.S. Mortgage as its authorized seller.

147.     Fannie Mae knew that, as a result of its efforts to obtain business from Suffolk and the other credit unions through U.S. Mortgage, that Suffolk and the other credit unions would retain U.S. Mortgage's CU National as servicer for their mortgage portfolios.

148.     It was foreseeable to Fannie Mae that an identifiable class of plaintiffs -- the federal credit unions who were selling mortgage loans to it through its authorized seller,

U.S. Mortgage -- could suffer economic injury as a result of their dealings with, and the conduct of, U.S. Mortgage.

149.    Fannie Mae owed a duty of care to Suffolk to take reasonable measures to avoid the risk of causing economic damages to Suffolk.

150.    In 2005, when a credit union's accountant complained to Fannie Mae that U.S. Mortgage was unduly delaying the remittal of payments for mortgage loans that had been sold to Fannie Mae, Fannie Mae responded by undertaking to investigate the U.S. Mortgage practices that were causing issues between U.S. Mortgage and the credit unions on the loan purchases made by Fannie Mae.

151.    Fannie Mae's decision to investigate U.S. Mortgage's practices in connection with the credit unions evidenced Fannie Mae's understanding that it owed a duty of care to the credit unions, including Suffolk, to take reasonable measures to avoid the risk of causing economic damages.

152.    Fannie Mae failed to exercise reasonable care when it investigated the complaint about U.S. Mortgage's delays in remitting the proceeds of sales the credit unions made to Fannie Mae through U.S. Mortgage.

153.    Fannie Mae failed to exercise reasonable care when it reviewed loan transfer documentation on the Stolen Mortgages.

154.    Fannie Mae failed to exercise reasonable care when it purchased the Stolen Mortgages without taking any steps to verify the authority of the persons who had executed allonges to the notes for the Stolen Mortgages.

155.    Fannie Mae failed to exercise reasonable care when it approved and re-approved U.S. Mortgage as its authorized seller.

156.   Fannie Mae failed to exercise reasonable care in its training and supervision of U.S. Mortgage.

157.   Fannie Mae failed to exercise reasonable care in its review of U.S. Mortgage financial statements and information.

158.   Fannie Mae failed to exercise reasonable care in its securities trading relationship with U.S. Mortgage, including but not limited to its failures to set proper trading limits, to monitor trading activity, to make margin calls, and to otherwise control U.S. Mortgage's trading.

159.   Fannie Mae's negligence and failure to exercise reasonable care, as described herein, directly and proximately caused financial injury to Suffolk.

160.   The damages caused by Fannie Mae's negligence will be determined at trial, but is believed to be in excess of $42 million.

**WHEREFORE**, Suffolk demands judgment in its favor and against Fannie Mae for compensatory damages in an amount not less than $42 million, consequential damages, costs of suit, and such other and further relief as the Court deems just and proper.

## COUNT 3 -- DECLARATORY RELIEF

161.   Suffolk repeats, restates and realleges each and every allegation contained in paragraphs 1 through 160 as though fully set forth herein.

162.   Suffolk contends that some of the notes transferred to Fannie Mae were duplicates and/or forgeries, as opposed to the authentic, original instruments for the Stolen Mortgages at issue.

163.   Suffolk contends that the signatures of McGrath and Carti on the loan transfer documentation at issue were unauthorized and, as a result, Fannie Mae is not a holder of the Stolen Mortgages or a person entitled to enforce them.

164.    Suffolk contends that Fannie Mae is not a holder in due course of the Stolen Mortgages because it failed to adhere to reasonable commercial standards of fair dealing.

165.    Fannie Mae contends that all of the notes it possesses for the Stolen Mortgages are authentic, original instruments and that it is a holder in due course, entitled to enforce those notes.

**WHEREFORE,** pursuant to 28 U.S.C. §2201, Suffolk demands judgment in its favor against defendant Fannie Mae in the form of declaration that (a) with respect to the Stolen Mortgages for which Fannie Mae does not possess an authentic, original note, Fannie Mae has no rights with respect to such Stolen Mortgages and must disgorge all funds Fannie Mae has received in connection with such Stolen Mortgages; and (b) Fannie Mae does not have any right to enforce the notes and mortgages underlying the Stolen Mortgages or receive any payments thereon, must provide an accounting of all sums received in connection with the Stolen Mortgage and return all of such sums, and must take whatever actions are necessary, if any, to restore ownership of the Stolen Mortgages to Suffolk.

Dated:  May 28, 2010
        New York, New York        Respectfully Submitted,


        SONNENSCHEIN NATH & ROSENTHAL LLP


        By:      /s/  Keith C. Nusbaum      
              Keith C. Nusbaum (KN 0687)

        Gary Meyerhoff (*Pro Hac Vice* motion to be filed)
        Hugh M. McDonald
        Keith C. Nusbaum
        1221 Avenue of the Americas, 23rd Floor
        New York, NY 10020
        Telephone: (212) 768-6700
        Facsimile:  (212) 768-6800

        Attorneys for Plaintiff Suffolk Federal Credit Union

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Suffolk

Federal Credit Union hereby demands trial by jury on all issues.


Dated:  May 28, 2010
         New York, New York                    SONNENSCHEIN NATH & ROSENTHAL LLP


                                               By:  _____/s/  Keith C. Nusbaum_____
                                                          Keith C. Nusbaum (KN 0687)

                                               Gary Meyerhoff (*Pro Hac Vice* motion to be filed)
                                               Hugh M. McDonald
                                               Keith C. Nusbaum
                                               1221 Avenue of the Americas, 23rd Floor
                                               New York, NY 10020
                                               Telephone: (212) 768-6700
                                               Facsimile:  (212) 768-6800

                                               Attorneys for Plaintiff Suffolk Federal Credit Union

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

I hereby certify that the within matter in controversy is not the subject of any other

pending action.

Dated: May 28, 2010
      New York, New York         SONNENSCHEIN NATH & ROSENTHAL LLP


By:     /s/  Keith C. Nusbaum
               Keith C. Nusbaum (KN 0687)

Gary Meyerhoff (*Pro Hac Vice* motion to be filed)
Hugh M. McDonald
Keith C. Nusbaum
1221 Avenue of the Americas, 23rd Floor
New York, NY 10020
Telephone: (212) 768-6700
Facsimile:  (212) 768-6800

Attorneys for Plaintiff Suffolk Federal Credit Union

**ATTORNEY STATEMENT PURSUANT TO LOCAL RULE 201.1(d)(3)**

Pursuant to Local Rule 201.1(d)(3), the undersigned, attorney of record for Plaintiff Suffolk Federal Credit Union, hereby certifies and declares that the damages recoverable by Plaintiff in this action exceed the sum of $150,000, exclusive of interest and costs of suit, and of any claim for punitive, exemplary or treble damages.

I hereby declare under penalty of perjury that the foregoing statements are true and correct pursuant to 28 U.S.C. § 1746.

Dated: May 28, 2010
      New York, New York         SONNENSCHEIN NATH & ROSENTHAL LLP

By: _____/s/  Keith C. Nusbaum_____
           Keith C. Nusbaum (KN 0687)

Gary Meyerhoff (*Pro Hac Vice* motion to be filed)
Hugh M. McDonald
Keith Nusbaum
1221 Avenue of the Americas, 23rd Floor
New York, NY 10020
Telephone: (212) 768-6700
Facsimile:  (212) 768-6800

Attorneys for Plaintiff Suffolk Federal Credit Union