<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUFFOLK FEDERAL CREDIT UNION, | |
| Plaintiff, | |
| | Civil Action No. 10-2763 (GEB) |
| v. | |
| | **MEMORANDUM OPINION** |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | |
| Defendant. | |

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court upon the Motion to Dismiss in part (Doc. No. 15) filed by the defendant Federal National Mortgage Association. ("Fannie Mae"). The plaintiff Suffolk Federal Credit Union ("Suffolk") opposes the motion. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will deny Defendant's motion.

**I.     BACKGROUND**

The matter presented before this Court involves mortgages and their underlying negotiable notes that were initially issued by Suffolk to its members, but were then stolen by a

1

third party and sold to Fannie Mae.[1]  Fannie Mae asserts in its defense that it is a bona fide purchaser of these mortgage interests and therefore should not be held liable.  Fannie Mae brings the instant Motion to Dismiss in part as it relates to the cause of action for negligence that Suffolk has stated in its Complaint.

Suffolk is "a cooperative, not-for profit credit union that . . . provides residential mortgage loans to its members." (Compl. ¶ 1; Doc. No. 1.)  It depends on third party companies or mortgage servicers "to handle the origination and servicing of the loans it provides" and "from time to time . . . balance[s] its portfolio by selling a portion of the residential mortgage loans it originates in the secondary mortgage market."  (Id. at ¶ 3.)  Fannie Mae, a "government created, private-shareholder owned corporation" "has set and controlled that [secondary] market by . . . only purchasing mortgage loans through companies it picks and certifies as Fannie Mae 'authorized' sellers."  (Id. at ¶ 2, 3.)  U.S. Mortgage Corporation ("U.S. Mortgage") is one of these authorized sellers, and CU National Mortgage, LLC ("CU National") is a division of U.S. Mortgage that acts as a mortgage servicer.  (Id. at ¶ 3.)  Beginning in 2003, CU National "assisted Suffolk in originating new mortgage loans and servicing Suffolk's loan portfolio" by "facilitat[ing] the sales of selected mortgage loans to Fannie Mae" and "arrang[ing] for Suffolk to make the sales through U.S. Mortgage."  (Id. at ¶ 4.)  A Servicing Agreement was in place between Suffolk and CU National.  (Id. at ¶¶ 33-37.)

An individual named Mark McGrath was the Chief Executive Officer ("CEO") of U.S. Mortgage and a major shareholder of Fannie Mae.  (Id. at ¶ 5.)  He also sat on Fannie Mae's

---

[1] For the purposes of this memorandum opinion, the Court accepts the allegations in the Complaint as true.

Customer Advisory Board ("CAB").  "The CAB is a group of mortgage sellers that Fannie Mae uses to gain information on the needs of its consumers," with each seller having been appointed by Fannie Mae because the person is considered one of the "best sellers in the region or up-and-coming stars in mortgage loan sales."  (Id. at ¶ 24.)  "As part of CAB, McGrath traveled to Phoenix and Philadelphia to participate in conferences with Fannie Mae executives and members of Fannie Mae's purchasing teams."  (Id. at ¶ 25.)  "Fannie Mae's business interests were served by keeping McGrath and U.S. Mortgage happy and in place as its authorized seller so it could continue to purchase large volumes of mortgages from credit unions like Suffolk."  (Id. at ¶ 22.)

In 2009, "Suffolk learned that U.S. Mortgage ha[d] stolen 189 of the mortgage loans it was servicing (the "Stolen Mortgages"), worth more than $42 million[2] and sold them to Fannie Mae."  (Id. at ¶ 7.)  Suffolk states in its Complaint that "McGrath and another U.S. Mortgage employee, Ron Carti, had prepared and signed loan transfer documents that falsely identified themselves as executives of Suffolk" and that "Fannie Mae accepted the documents and paid U.S. Mortgage millions of dollars without ever checking into McGrath's or Carti's authority to execute loan transfer documents on behalf of Suffolk."  (Id. at ¶ 7.)   The theft of the Stolen Mortgages occurred throughout years 2004, 2005, 2006, 2007, 2008, and 2009, during which time "U.S. Mortgage officers and employees . . . selected loans that Suffolk had instructed CU National to retain in Suffolk's portfolio and . . . sold those loans to Fannie Mae without Suffolk's knowledge or authorization."  (Id. at ¶ 39.)  "U.S. Mortgage sold the Stolen Mortgages to Fannie Mae by having McGrath and Carti execute the documentation themselves" despite the fact that

---

[2]   Paragraph 42 of the Complaint states that the Stolen Mortgages were worth more than $142 million.  (Compl. ¶ 42; Doc. No. 1.)

3

only authorized Suffolk employees had authority to sign these documents. (Id. at ¶ 41.) Neither McGrath nor Carti had the authority to execute these documents. (Id. at ¶¶ 71-77.) In addition, U.S. Mortgage "concealed its actions from Suffolk . . . for years by continuing to make monthly payments on the stolen mortgages as if they remained in [Suffolk's] portfolio[]." (Id. at ¶ 9.) "McGrath has already pleaded guilty to crimes in connection with his unauthorized sales of the Stolen Mortgages and, in doing so, had admitted that he and Carti executed loan transfer documents purportedly on Suffolk's behalf without Suffolk's authorization." (Id. at ¶ 48.) McGrath also admitted that "he did not always deliver an authentic original note to Fannie Mae in his unauthorized sales" and that in some cases "he forged the name of the borrower on a newly created note" and in others "he had color copies of notes made and delivered a copy of the note to Fannie Mae." (Id. at 51.)

      Fannie Mae accepted these documents and "failed to employ any fraud detection procedures when it received fraudulent loan transfer documentation U.S. Mortgage was passing to it" and "failed to notice that McGrath and Carti had identified themselves on the documentation as being the officers of 28 separate companies, located in multiple states, or that the mortgage assignments purportedly from these companies were all notarized in one state, New Jersey." (Id. at ¶ 8.) While "Fannie Mae's general practices and procedures required that it verify that the final endorsement on a mortgage loan was made, in blank, by a Fannie Mae authorized seller, and that the paperwork provided evidenced no break in the chain of endorsements from the initial lender to the authorized seller," these "practices and procedures did not include the review of intervening endorsements for indicia of fraud" and they did not "include any inspection of the borrower's signatures on the notes Fannie Mae was purchasing to

determine whether there were indicia of forgery." (Id. at ¶¶ 57, 58.)  Not only was there no general practice or procedure to make these types of examination, Fannie Mae did not make these type of examinations in this case. (Id. at ¶¶ 59, 60.)  Moreover, "[o]n or about December 22, 2008, Fannie Mae was specifically informed by the U.S. Attorney's Office that the government was investigating CU National and U.S. Mortgage for the unauthorized sale of credit union loans to Fannie Mae.  After this notification, Fannie Mae purchased Stolen Mortgages valued in excess of $6.6 million from U.S. Mortgage." (Id. at ¶ 70.)

While Fannie Mae claims that "U.S. Mortgage, McGrath, and Carti had 'apparent authority' to sell the Stolen Mortgages, Suffolk states that "Fannie Mae did not form any 'reasonable belief' about McGrath's or Carti's authority, nor did Fannie Mae observe any custom or practice on authorized sales" and to this end, "Fannie Mae's loan documentation review procedures did not allow for any such beliefs to be formed nor observations to be made." (Id. at ¶¶ 78-81.)  Fannie Mae's employees also did not individually reasonably believe that U.S. Mortgage, McGrath, or Carti had such apparent authority. (Id. at ¶¶ 81-83.)  Prior to its purchase of the Stolen Mortgages, Fannie Mae never reviewed the Servicing Agreement between Suffolk and CU National. (Id. at ¶¶ 85, 86.)  Moreover, "Fannie Mae paid little attention to what U.S. Mortgage filed with Fannie Mae," "did not follow its own regulations" "for monitoring and approving its authorized sellers," and "ignored U.S. Mortgage's growing financial troubles and trading losses, [which were] red flags of the fraud it was perpetrating." (Id. at ¶¶ 96-128.)

The thefts were eventually discovered, and "by letter dated May 5, 2009, Suffolk . . . demanded that Fannie Mae return its Stolen Mortgages.  Fannie Mae refused" and "asserts that it was unaware of the fraud and purchased the notes in 'good faith,' entitling Fannie Mae to keep

5

them as a 'holder in due course.'" (Id. at ¶ 10.)

Suffolk filed the instant Complaint on May 28, 2010, listing three causes of action, respectively based upon the theories of conversion ("Count One") and negligence ("Count Two") and in addition seeking declaratory relief pursuant to 28 U.S.C. § 2201. (Doc. No. 1.) Fannie Mae filed its Motion to Dismiss on July 30, 2010. (Doc. No. 15.) Suffolk filed its opposition on August 23, 2010, (Doc. No. 22) and Fannie Mae filed a reply brief on August 30, 2010. (Doc. No. 23.) Fannie Mae also filed an Amended Answer to the Complaint and its affirmative defenses on September 28, 2010. In addition, this matter was consolidated on September 9, 2010, with three other matters, Civil Action Nos. 09-1295, 09-4782, and 10-473, for pretrial purposes only. (Doc. No. 25.) The Court's consideration of Fannie Mae's Motion to Dismiss in Part follows.

## II.  DISCUSSION

### A.  Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 570). The plausibility standard requires that "the plaintiff plead[] factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556).  Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (citing Twombly, 550 U.S. at 555); see also Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainants' claims are based upon those documents. See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

### B.    The Parties' Arguments

Fannie Mae argues that Count Two of the Complaint should be dismissed.  (Def.'s Br. at 1; Doc. No. 15-1.)  It asserts that "the Uniform Commercial Code ["UCC"] preempts common law claims that are inconsistent with the purposes and policies of the Code."  (Id. at 7.)  Specifically referencing Article 3 of the U.C.C., Fannie Mae states that because Article 3 "provide[s] a set of rules and policies to govern both the transfer of negotiable instruments and the allocation of loss when disputes arise over who is the proper owner of a negotiable instrument," Suffolk's negligence claim must be dismissed as it is "contrary to the purposes and policies of Article 3's holder in due course law."  (Id. at 9.)  Fannie Mae also asserts that "Suffolk is trying to circumvent holder in due course law."  (Id.)  Further, Fannie Mae points out that because "[t]here is no discovery rule exception to Article 3's statute of limitations for a

conversion claim . . . such a claim is time barred for any loans sold to Fannie Mae in 2004 and 2005." (Id. at 10.) Fannie Mae argues that because Suffolk's cause of action is properly brought pursuant to Article 3 in that it involves negotiable instruments, Suffolk is not permitted to assert a common law negligence claim in this matter. (Id. at 13.)

In opposition, Suffolk argues that the argument asserted by Fannie Mae has been previously "considered and rejected by the United States Court of Appeals for the Third Circuit." (Pl.'s Opp. Br. at 1; Doc. No. 22.) Suffolk cites Yahn v. McDonnell, Inc. v. Farmers Bank of Delaware, 708 F.2d 104 (3d Cir. 1983), and asserts that it "the courts in this Circuit that have considered the remedy afforded by the holder in due course doctrine have held that it does not preempt a claim for negligence." (Pl.'s Opp. Br. at 2.) Rather, Suffolk maintains that the actual issue before the Court is "not whether the UCC, or even Article 3, appears to conflict with some of the allegations of a negligence claim" but rather "whether the specific remedial section of the UCC at issue – here, the holder in due course doctrine – provides a comprehensive remedy for the specific negligence claim asserted." (Id. at 9.) To this end, Suffolk avers that the Third Circuit addressed this issue in Yahn and held that "the allocation of rights created by the holder in due course doctrine [does not present] such a comprehensive remedial scheme as to supplant a negligence action." (Id. at 10) (citing Yahn, 708 F.2d at 113.) Suffolk also asserts that Count Two "rests primarily on conduct completely distinct from Fannie Mae's actions as a purchaser" and with respect to this specific allegation, "Fannie Mae makes no argument as to how that type of negligence claim conflicts with Article 3." (Pl.'s Opp. Br. at 15.)

In response, Fannie Mae asserts that Yahn is neither relevant nor controlling and does not apply to this matter because the Third Circuit therein expressly limited its holding to the

circumstances of that case.  (Def.'s Reply Br. at 1; Doc. No. 23.)  Fannie Mae maintains that "Yahn involved a plaintiff who claimed to be a holder in due course and pled a negligence claim only in the alternative" whereas here, it is Fannie Mae, the defendant, "who asserts holder in due course status as a defense."  (Def.'s Reply Br. at 3.)  In addition, Fannie Mae argues that "there was no contention in Yahn that Yahn's negligence somehow prevented it from being a holder in due course" whereas here, "Suffolk's negligence claim is against Fannie Mae, which asserts it is a holder in due course."  (Id. at 4.)

      C.      **Analysis**

Defendant argues that the New Jersey codification of Article 3 of the UCC precludes Plaintiff's common law cause of action for negligence under these circumstances.  It is well-established that "where the Code provides a comprehensive remedy for parties to a transaction, a common law action is barred."  Yahn, 708 F.2d at 113 (citing New Jersey Bank v. Bradford Securities Operations, 690 F.2d 339, 345-46 (3d Cir. 1982)).  However, "a remedy in tort will be recognized where the Code's policy is furthered by 'placing the risk of loss on the party most able to minimize the risk.'"  Id. (citing New Jersey Bank, 690 F.2d at 347).  In other words, "it is necessary to determine (1) whether the Code provides a comprehensive remedial scheme for the parties to the transaction, and (2) whether the policy of the Code is furthered by placing the risk of loss on the party most able to minimize that risk."  Progressive Casualty Insurance Co. v. PNC Bank, N.A., No. 98-6480, 1999 U.S. Dist. LEXIS 11299, *22 (E.D. Pa. July 26, 1999).  One court summarized the standard as follows: "parallel Code and common law claims may be maintained except in circumstances where (1) the Code provides a comprehensive remedial

scheme and (2) reliance on the common law would undermine the purposes of the Code." Bucci v. Wachovia Bank, N.A., 591 F. Supp. 2d 773, 779 (E.D. Pa. 2008) (citations omitted).

### 1. Whether the Remedy Article 3 Provides is Comprehensive

The Court turns first to whether the Code provides a comprehensive remedy for the parties to this transaction. Because neither party raises a choice of law issue, the Court will apply the law of the forum. Article 3 of the UCC, which governs negotiable instruments,[3] has been codified by the State of New Jersey at N.J.S.A. § 12A:3-101, et. seq. A negotiable instrument is

> an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise, if it:
>
> (1) is payable to bearer or to or first comes into possession of a holder;
>
> (2) is payable on demand or at a definite time; and
>
> (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain an undertaking or power to give, maintain, or protect collateral to secure payment, an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or a waiver of the benefit of any law intended for the advantage or protection of an obligor.

N.J.S.A. § 12A:3-104(a). "Mortgages provide security for the debtor's obligation to pay an underlying obligation, ultimately permitting the mortgagee to force the sale of the property to satisfy that obligation." Bank of New York v. Raftogianis, 2010 N.J. Super. LEXIS 221, *3 (N.J. Chan. 2010) (citing Gotlib v. Gotlib, 399 N.J. Super. 295, 944 A.2d 654 (App. Div. 2008); Garroch v. Sherman, 6 N.J. Eq. 219 (Ch. 1847); Bellistri v. Ocwen Loan Servicing, LLC, 284

---

[3] Neither party asserts that the Stolen Mortgages at issue here are not negotiable instruments.

10

S.W.3d. 619 (Mo. 2009)).  See also 6-103 New Jersey Transaction Guide § 103.20.  "Typically, the debt secured by a mortgage will be evidenced by a bond or a note.  Notes, in turn, may be negotiable or nonnegotiable."  Id. at *4.  "The debt itself is typically evidenced by some other document."  Id.  "Checks, drafts, and certificates of deposit [("CD's")] are other forms of negotiable instruments, which are subject to the UCC."  Id.

New Jersey codified the following with respect to "Negligence contributing to forged signature or alteration of instrument":

> a. A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
>
> b. Under subsection a. of this section, if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
>
> c. Under subsection a. of this section, the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection b. of this section, the burden of proving failure to exercise ordinary care is on the person precluded.

N.J.S.A. §§ 12A:3-406.  In addition, § 3-302 and § 3-306 of New Jersey's UCC address enforcement of negotiable instruments with respect to "holders in due course."  A "holder in due course" is "one who takes a negotiable instrument for value, in good faith and without notice of any defense or claim against it."  Carnegie Bank v. Shalleck, 256 N.J. Super. 23, 34 (App. Div. 1992) (citing N.J.S.A. § 12A:3-302; N.J.S.A. § 12A:3-102(1)(e)).

Suffolk directs this Court's attention to the holding in Yahn for the proposition that it is not barred from asserting its claim.  In Yahn, the Third Circuit addressed an appeal from the

District of Delaware, which decided cross-motions for summary judgment. Yahn & McDonnell, Inc. v. Farmers Bank of Delaware, 538 F. Supp. 712, 713 (D. Del. 1982), vacated by Yahn v. McDonnell, Inc. v. Farmers Bank of Delaware, 708 F.2d 104 (3d Cir. 1983). The plaintiff there was the holder of a CD, but when the plaintiff presented the CD to the defendant for payment it was dishonored. Yahn, 708 F.2d at 105. The defendant asserted that it had previously paid on the CD as its defense. Id. at 105. The issue addressed by the District Court, therefore, was whether the plaintiff was the holder in due course because absent such a finding, the defendant's asserted defense of previous payment would stand. Yahn, 538 F. Supp. at 716. Although "[t]he [D]istrict [C]ourt held that [the] plaintiff was not a holder in due course because it took the instrument with notice that it was overdue," the Third Circuit vacated this holding and stated that in reaching its decision, "the [D]istrict [C]ourt failed to consider whether there is a difference between certificates of deposit and other negotiable instruments." Yahn, 708 F.2d at 107. The Court also held that "since an action in negligence is separate and distinct from any claim based on the instrument or the underlying contract, we do not believe that the allocation of rights created by the holder in due course doctrine presents such a comprehensive remedial scheme as to supplant a negligence action." Id. at 113 (citing New Jersey Bank, 690 F.2d at 346-47). However, as did the court in Progressive Casualty Insurance Company v. PNC Bank, this Court also concludes that Yahn is not particularly "helpful for the purpose of determining whether the UCC provides a comprehensive remedy, or whether allowing an action in negligence is consistent with the policy of the Code by placing the risk of loss on the party most able to minimize that risk" because "in Yahn the plaintiff was asserting rights as a holder in due course, and not, as [did the defendants in Progressive], who employed the doctrine as an affirmative

12

defense." Progressive Casualty Ins. Co., 1999 U.S. Dist. LEXIS 11299, at **22-23 n.12.

In the matter at hand just as in Progressive, the movant cites the holder in due course doctrine as an affirmative defense, and therefore, the Court turns its analysis to the decision rendered in Progressive. There, the District Court addressed a motion to dismiss filed on behalf of the defendant bank, which argued that the plaintiff's negligence claim should be dismissed because the Pennsylvania Commercial Code displaces common law causes of action for negligence. Id. at *5. The negotiable instrument at issue was a check that was issued for the purpose of making a mortgage loan. Id. at *2. The court recognized that the two "most prominent sections in the UCC dealing with negligence are § 3-406 and § 4-406" and summarized that "[t]he former concerns negligence contributing to a forced signature or alteration of an instrument" while "[t]he latter provision concerns the duty of a customer to discover and report unauthorized signatures or alterations." Id. at *23. Having considered these provisions, the Progressive court followed the reasoning in New Jersey Bank and Yahn and concluded that "the remedy provided for under Articles 3 and 4 is not comprehensive" and therefore, "a common law action in negligence will not be barred." Progressive, 1999 U.S. Dist. LEXIS 11299, at **23-25. The Court holds that Progressive is also instructive but not binding in that it interpreted the Pennsylvania Commercial Code

Fannie Mae has failed to cite a case that is on point in support of its position. In addition, this Court has also not been able to locate a case in which the plaintiff has alleged a scheme such as the one alleged here and in which that court dealt with the issue at hand, namely whether the UCC provides a comprehensive remedy. Here, "Suffolk alleges Fannie Mae's failure to exercise reasonable care in making U.S. Mortgage its authorized seller and properly monitoring,

supervising, and auditing U.S. Mortgage." (Pl.'s Opp. Br. a 15; Compl. ¶¶ 142-160.) The Court concludes that the scheme alleged is not addressed at all in the UCC, and the provisions that do address causes of action for negligence do not contemplate the situation alleged in Plaintiff's complaint. However, without any other guidance, the Court notes that the Progressive decision is similar to the one at hand. There, the district court addressed allegations that "the defendant was careless and negligent in its handling of the account and the check." Progressive, 1999 U.S. Dist. LEXIS 11299, at *18. Here, we have allegations of a system in which Fannie Mae purportedly failed to exercise the reasonable care. This type of scenario is not contemplated by the UCC, which rather addresses negligence in terms of an "alteration of an instrument or to the making of a forged signature on an instrument." N.J.S.A. § 12A:3-406(a). Certainly, here, there are details alleged involving forged signatures or altered documents, (see, e.g., Compl. ¶ 51), but the core of the cause of action for negligence does not rely on these isolated situations. Rather, the thrust of the Complaint involves allegations regarding Fannie Mae's overall policy and procedure, or in other words, the manner in which it handled its interactions with U.S. Mortgage. To the extent that Fannie Mae argues that Suffolk is attempting to circumvent holder in due course law, the Court rejects this argument in this context and at this time. The Court concludes that this issue is better addressed in any subsequent motion for summary judgment. For these reasons, the Court concludes that as to this claim, the remedies provided in Article 3 are not comprehensive.

      2.      Whether a Remedy in Tort will Further the Policy of the Code by Placing the Risk of Loss on the Party Most Able to Minimize the Risk

"The general policy of the Code . . . is to allocate the risk of loss to the depositary bank in

cases involving forged instruments." Progressive, 1999 U.S. Dist. LEXIS 11299, at *27. "Under the provisions of the UCC, 'the risk of forged indorsements . . . is usually on the shoulders of the immediate transferee from the forger." Id. at * 26 (citing Barkley Clark and Barabara Clark, The Law of Bank Deposits, Collections and Credit Cards, P. 12.01 at 12-3 (rev. ed. 1999)).  Here, the Court concludes that the party best able to minimize the risk was Fannie Mae.  The policies it implemented in its interactions with U.S. Mortgage were in its control alone.  The Court concludes that the cause of action for negligence lodged against Fannie Mae, therefore, will further the policy of the Code.

### III.   CONCLUSION

For the foregoing reasons, the Court denies Fannie Mae's Motion to Dismiss. (Doc. No. 15.) An appropriate form of order accompanies this memorandum opinion.

Dated: March 7, 2011

    s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.